LaFARGE CORP., Beazer East, Inc., HM Holdings, Inc., Federal Insurance Company and other Members of the Chubb Group of Insurance Companies, The St. Paul Fire & Marine Insurance Company and Member Insurance Companies of the St. Paul Group, Royal Indemnity Company and other Members of the Royal Group of Insurance Companies, Fireman's Fund Insurance Company and other Member Companies of the Fireman's Fund Insurance Companies, and American International Group, Inc., The Insurance Company of the State of Pennsylvania, National Union Fire Insurance Company of Pittsburgh, Pa., Birmingham Fire Insurance Company, and other Member Companies of the American International Group, Petitioners,

v.

COMMONWEALTH of Pennsylvania, INSURANCE DEPARTMENT, Respondent.

AAF–McQUAY, INC. (formerly known as Snyder General Corporation), Avco Corporation, Borden, Inc., The Dial Corp., Elf Atochem North America, Inc., General Refractories Company, Hercules, Inc., Maricopa County, a body corporate and politic of the State of Arizona, Pfizer, Inc., PRB Metal Products, Inc., Quaker Chemical Corporation, Reichhold Chemical Corp., Reynolds Metals Company, Textron, Inc., and Wheeling Pittsburgh Steel Corp., Petitioners,

v.

PENNSYLVANIA DEPARTMENT OF INSURANCE AND BANKERS STANDARD INSURANCE COMPANY, Century Indemnity Company, Century Reinsurance Company, Cigna Corporation, Cigna Holdings, Inc., Cigna Property & Casualty Insurance Company, Cigna Insurance Company, Cigna Employers Insurance Company, Cigna Insurance Company of Ohio, Cigna Insurance Company of Texas, Cigna Fire Underwriters Insurance Company, Cigna Indemnity Insurance Company, Cigna Reinsurance Company, Cigna Specialty Insurance Company, Cigna Insurance Company of Illinois, Coast To Coast Management Company, Delaware Reinsurance Company, Indemnity Insurance Company Of North America, Insurance Company of North America, Ina Corporation, Ina Financial Corporation, Ina County Mutual Insurance Company, Illinois Union Insurance Company, and Pacific Employers Insurance Company, Respondents.

PPG INDUSTRIES, INC., Dresser Industries, Inc., Crane Company, Petitioners,

v.

INSURANCE DEPARTMENT, Respondent.

ALLEGHENY PITTSBURGH COAL COMPANY, West Penn Power Company, West Penn West Virginia Water Power Company, West Virginia Power and Transmission Company, Monongahela Power Company, Allegheny Power System, Inc., Allegheny Power Service Corporation, Allegheny Generating Company and Potomac Edison Company, Truk–Away of R.I., Inc. and Domtar, Inc., Petitioners,

v.

PENNSYLVANIA INSURANCE DEPARTMENT, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 11, 1996.

Decided March 5, 1997.

Lawrence T. Hoyle, Jr., Philadelphia, for petitioner LaFarge Corp.

Floyd Abrams, New York City, for petitioners American International Group, Inc., et al.

John Ellison, Philadelphia, for petitioners CIGNA policyholders.

Robert L. Byer, Harrisburg, for petitioner PPG Industries.

Jerome J. Shestack, Philadelphia, for respondent Insurance Department.

Robert J. Sullivan, New York City, for intervenor INA Financial Corporation.

Before DOYLE, PELLEGRINI, FRIEDMAN, KELLEY, FLAHERTY and LEADBETTER, JJ.

PELLEGRINI, Judge.

Before this Court are appeals filed by the policyholders (Policyholders) of INA Financial Corporation (INA Financial) and insurance companies that are members of a reinsurance group (Reinsurers)[1] from a decision of the Pennsylvania Insurance Department (Department)[2] approving a plan of restructure and division filed by INA Financial under the GAA Amendments Act of 1990 (GAA Amendments).[3]

## I.

### A.

This case involves a decision made by the Department to allow INA Financial to divide into two different insurance companies under the Business Corporation Law of 1988. 15 Pa.C.S. §§ 1101–4162. Section 1951(a) of the Business Corporation Law provides for the division of corporations as follows:

> Any domestic business corporation may, in the manner provided in this subchapter, be divided into two or more domestic business corporations incorporated or to be incorporated under this article. . . .

15 Pa.C.S. § 1951(a). If a corporation's plan of division and corresponding articles of division comply with the statutory requirements of the Business Corporation Law, then the corporation may be divided. 15 Pa.C.S. §§ 1952, 1953, 1956. Once the division has occurred,

> [T]he resulting corporations shall each thenceforth be responsible as separate and distinct corporations only for such liabilities as each corporation may undertake or incur in its own name but shall be liable for the liabilities of the dividing corporation in the manner and on the basis provided in subparagraphs (iv) and (v).

15 Pa.C.S. § 1957(b)(1)(ii). Subparagraph (iv) provides that:

> (iv) One or more, but less than all, of the resulting corporations shall be free of the liabilities of the dividing corporation to the extent, if any, specified in the plan, if no fraud of corporate creditors or of minority shareholders or shareholders without voting rights or violation of law shall be ef-

---

1. Because of the large number of Policyholders and Reinsurers that have appealed the Commissioner's decision, the names of each party will not be set forth in the text of this Opinion. The reader is referred to the captions to ascertain those parties that have filed the present appeals.

2. Although the Department is statutorily vested with the authority to approve a disapprove a plan of restructure or division, it was the Insurance Commissioner (Commissioner) who made the decision for the Department in this case.

3. Act of December 19, 1990, P.L. 834, §§ 101–404, 15 P.S. §§ 21101–21404. The GAA Amendments are amendments to the General Association Act of 1988, Act of December 21, 1988, P.L. 1444, §§ 101–304, 15 P.S. § 20101–20304.

fected thereby, and if applicable provisions of law are complied with.

15 Pa.C.S. § 1957(b)(1)(iv).[4] Under the Business Corporation Law, therefore, a corporation may divide into two or more corporations, and absent fraud on the dividing corporation's shareholders and creditors, all but one of the resulting corporations will be free from the dividing corporation's liabilities and obligations.

As originally enacted, the Business Corporation Law did not apply to insurance companies. 15 Pa.C.S. § 103. However, its provisions were extended to insurance companies via the GAA Amendments. Section 205(a) of the GAA Amendments authorizes the division of an insurance company by providing that:

> General rule.—Any plan of merger, consolidation, exchange, asset transfer, division or conversion of any insurance corporation ... shall be come effective only if approved by the Insurance Department....

15 P.S. § 21205(a). As to the approval required by the Department, Section 205(b) specifies that such transactions "shall be approved if ... in accordance with law and not injurious to the interests of the policyholders and creditors." 15 P.S. § 21205(b). In order to make those determinations, Section 207(c) of the GAA Amendments provide that:

> Procedure before the department.—For the purpose of enabling the department to make the finding or determination required by subsection (b), the department shall afford reasonable notice and opportunity for hearing, which shall be public, and, before or after any such hearing, it may make such inquiries, audits and investigations, and may require the submission of such supplemental studies and information, as it may deem necessary and proper to

enable it to reach a finding or determination.

15 P.S. § 21207(c). The GAA Amendments further provide for judicial review, stating that:

> Orders of the department upon an application for a certificate of authority or other approval under this section shall be subject to judicial review in the manner and within the time provided or prescribed by law.

15 P.S. § 21207(d).

With the GAA Amendments, an insurance company can be divided so long as the Department has granted its approval of the division. If the approval has been given and the division occurs, then the provisions of the Business Corporation Law apply and all but one of the resulting companies will be relieved of the dividing insurance company's liabilities unless there has been fraud of corporate creditors or minority shareholders. Any decision by the Department will then be subject to judicial review.

### B.

In December, 1994, all of the property and casualty insurance companies under CIGNA Corporation (CIGNA), a Delaware business corporation, received a lower rating by A.M. Best, a nationally prominent rating agency. While they had previously received a rating of "A-", they were assigned a rating of "B+" because of their poor operating results and uncertain exposures to asbestos and environmental liabilities. As a result of receiving a "B+" rating, CIGNA would lose potential customers because some policyholders, governmental units, agents and brokers use an "A-" rating as a minimum qualification requirement when making a purchasing decision.

---

4. Subparagraph (v), which addresses the extent and nature of a resulting corporation's liability, provides that:

> (v) If the conditions in subparagraph (iv) for freeing one or more of the resulting corporations from the liabilities of the dividing corporation are not satisfied, the liabilities of the dividing corporation shall not be affected by the division nor shall the rights of creditors thereof or any person dealing with the corpo-

ration be impaired by the division and any claim existing or action or proceeding pending by or against the corporation may be prosecuted to judgment as if the division had not taken place, or the resulting corporations may be proceeded against or substituted in its place as joint and several obligors on such liability, regardless of any provision of the plan of division apportioning the liabilities of the dividing corporation.

INA Financial, a subsidiary of CIGNA, decided that the best way to increase its rating by A.M. Best was to allocate those previously written policies dealing with asbestos and environmental liabilities to a separate operating entity known as Century Indemnity Company (Century Indemnity).[5] The policyholders having asbestos and environmental liability policies would look only to Century Indemnity for coverage, and INA Financial would not be liable for any excess amount of liability exceeding the $500 million capital infusion and $800 million reinsurance coverage that it provided to Century Indemnity. INA Financial would continue in existence with its remaining assets and would continue to engage in the business of insurance. As a result of the plan for restructure and division, CIGNA would be able to cap its exposure for asbestos and environmental liability at the amount of capital and reinsurance that it provided to Century Indemnity based upon its contention that those funds were more than sufficient to cover the total liability.

Under the GAA Amendments, INA Financial was required to obtain approval from the Department to implement its plan for restructure and division. In support of its restructuring plan, INA Financial provided the Department with numerous documents at its request. Included in those documents were:

● a report of William M. Mercer that provided a peer review of the actuarial work performed to analyze the plan of restructure.

● a report by Milliman & Roberston that was an actuarial review of CIGNA's asbestos and environmental liability reserves.

● several agreements between CIGNA and its subsidiaries showing a continued relationship after the restructuring.

● a fairness opinion prepared by J.P. Morgan.

● a solvency opinion prepared by Houlihan, Lokey, Howard & Zukin.

● a reinsurance recoverable analysis that provided a review of the functioning of the reinsurance recovery.

● several pro forma balance sheets showing an allocation of assets to the resulting INA.

● the Tillinghast Reserve Review Report of CIGNA.

● a reconciliation of INA Financial's reserve activity and its model for testing the sufficiency of the assets to pay the asbestos and environmental liabilities of Century Indemnity, as well as information regarding CIGNA's asbestos and environmental exposures.

● CIGNA's complete SEC 10–Q filing for the period ending September 30, 1995.

In addition to the information submitted by INA Financial, the Department initiated a financial examination of CIGNA pursuant to what is commonly called the Examination Law.[6] To assist in that examination, the Department engaged the accounting firm of Deloitte and Touche. Additionally, the Department also engaged Tillinghast to perform a review of CIGNA's reserves, emphasizing its asbestos and environmental liability related reserves.

While this information was being submitted, the Department published notice of the plan of restructure in the *Pennsylvania Bulletin* on October 14, 1995, inviting comments from the public regarding the plan. The

---

5.  In January, 1995, INA Financial initially filed an application for review and approval of a plan of mini-restructuring that involved a partial rearrangement of its property and casualty intercompany reinsurance pools. Under the mini-restructuring, CIGNA created a second intercompany reinsurance pool in which four of its affiliates withdrew from the existing pool and created a new reinsurance pool, the "active pool." The remaining affiliates stayed in the existing pool, which was designated as the "inactive pool" and which contained all of CIGNA's asbestos and environmental liabilities. In its

mini-restructuring, CIGNA committed to infuse $125 million in capital into INA Financial. The mini-restructuring was approved by the Commissioner after numerous discussions with CIGNA and after the Department had gathered financial information from CIGNA.

6.  Section 323.3 of Article IX of the Insurance Department Act of 1921, Act of May 17, 1921, P.L. 789, § 903, *as added by the* Act of December 18, 1992, P.L. 1469, § 12, 40 P.S. § 323.3.

Department again published notice on October 28, 1995, stating that a public hearing would be held on the plan of restructure on December 8, 1995. In that notice, the Department requested written comments by November 13, 1995, which was later extended to December 4, 1995, and directed that persons interested in making a presentation at the public hearing to identify themselves and provide a brief statement of the topics they intended to discuss at that hearing. In two orders issued on November 30, 1995, the Department solicited further comments or objections from interested persons and scheduled additional hearings.

In response to the Department's invitation for comments or objections, numerous entities, including the Policyholders and Reinsurers, filed objections to the plan of restructure. Additionally, the Department received thousands of pages of written comments from interested persons. Those interested entities and persons that indicated a desire to speak at the public hearings were granted fifteen minutes to make their oral presentation. Additionally, the Department granted limited intervention to those entities and persons, including the Policyholders and Reinsurers, who indicated a desire to speak, solely for the purpose of submitting written comments and making oral presentations. Although granted limited intervention, the entities and persons were not permitted to cross-examine INA Financial's witnesses.

On November 12, 1995, a petition to recuse was filed by the Policyholders and Reinsurers, contending that the Commissioner should recuse herself from the matter because she had served as CIGNA's senior counsel from 1985 until 1992. The Commissioner denied that motion.

The Department then convened several public informational hearings to address INA Financial's plan of restructure and division. During the first hearing, which was held on November 28, 1995, there were approximately six hours of presentations before

the Commissioner adjourned the hearing to December 8, 1995. Also during that hearing, several participants asked that the Tillinghast, M & R, and Mercer reports and materials be made public. That request was denied by the Commissioner in an order dated December 8, 1995.

In an order dated November 30, 1995, the Department indicated that a third hearing would be held on December 28, 1995, to allow interested individuals and entities to review materials and prepare responses. At the December 8, 1995 hearing, there were four and one-half hours of presentation, and at the December 28, 1995 hearing there were three hours of presentation. At the conclusion of that hearing, the oral comment portion of the proceedings was concluded because there were no further presenters. The record in the proceedings was held open until January 12, 1996, to allow CIGNA to submit additional written comments from itself and its consultants and to allow other interested persons to submit written comments.

After the record had been closed, the Department issued a decision approving INA Financial's plan for restructure and division with conditions imposed thereon.[7] In so doing, the Department entered an order that included 353 findings of fact and 45 conclusions of law. The Department rejected all of the objections to the plan and determined it to be just and reasonable. The Policyholders and Reinsurers now appeal to this Court.[8]

## II.

The Policyholders and Reinsurers argue that the procedures the Department employed in allowing the restructuring and division of INA Financial violated their statutory and constitutional due process rights. Because their interests are so substantial, the Policyholders and Reinsurers contend that they are entitled to a due process hearing

7. One such condition required CIGNA to provide notice to all of its policyholders of the transfer of liabilities under the plan.

8. The Insurance Department and INA Financial have filed a motion to quash the appeal on the

basis that the Policyholders and Reinsurers do not have standing to pursue an appeal. This motion was briefed and argued simultaneously with the merits of the appeal.

under the Administrative Agency Law[9] that would allow them to cross-examine INA Financial's witnesses and present their own witnesses as to the advisability of the division and restructuring. The Department and INA Financial argue, however, that the Policyholders and Reinsurers received all of the due process protections to which they were entitled under the GAA Amendments through the informational hearing and were not entitled to any full trial-type hearing under the Administrative Agency Law. Further, they contend that the Policyholders and Reinsurers have not been aggrieved by the Department's decision because any damages that they may suffer are speculative and have not yet occurred and, as such, they have no standing to maintain this appeal. Even if the Policyholders and Reinsurers have standing to maintain this appeal, the Department and INA Financial contend that the only way in which the Department's decision could not be approved would be if the Department abused its discretion in reaching that decision.

The difficulty in determining both the type of hearing(s) that has (have) to be held by the Department and the standard of review that we are to apply on appeal arises from the procedures that are set forth in the GAA Amendments and that the Commissioner is required to follow in ruling on an application for approval. Section 207(c) of the GAA Amendments provides that:

[T]he department shall afford reasonable notice and opportunity for hearing, which shall be public, and, before or after any such hearing, it may make such inquiries, audits and investigations, and may require the submission of such supplemental studies and information, as it may deem necessary or proper to enable it to reach a finding or determination....

15 P.S. § 21207(c). This provision, which allows the Department to gather information,

ex parte, at any point during the proceedings, even after the hearing has been held, suggests that the Department need only provide a public informational hearing prior to ruling on an application for approval.

Unlike the Administrative Agency Law, Section 207(c) does not require the production of a formal record, including a trial-type due process hearing. Nor does it, in and of itself, specifically provide for judicial review. If this were the only applicable provision of the GAA Amendments, our scope of review would be determined by whether the decision of the Department was an adjudication. If it were, then the provisions of the Administrative Agency Law would apply, *Turner v. Public Utility Commission*, 683 A.2d 942 (Pa.Cmwlth.1996) (Administrative Agency Law provides default procedures where none are specified in the statute), and anyone "aggrieved" would be entitled to a hearing under the Administrative Agency Law and would have standing to appeal any resulting decision to this Court.[10]

While the Administrative Agency Law would have been applicable by default if the GAA Amendments had gone no further, Section 207(d) of the GAA Amendments then provides that:

Orders of the department upon an application for a certificate of authority or other approval under this section shall be *subject to judicial review in the manner and within the time provided or prescribed by law.* (Emphasis added.)

15 P.S. § 21207(d).

Because the provisions of the Administrative Agency Law only apply if there are no specific procedures contained in the statute at issue,[11] and because Section 207(d) addresses judicial review of the Department's decision, the Department and INA Financial argue that this provision of the GAA Amend-

---

9. 2 Pa.C.S. §§ 101, 501–508, 701–704.

10. The Administrative Agency Law requires that testimony be stenographically recorded, that a full and complete record be kept of the proceedings, and that affected parties be afforded reasonable examination and cross-examination. 2 Pa.C.S. §§ 504, 505. Moreover, in compliance with due process requirements, interested parties

are entitled to know the claims of other parties to the proceedings, to hear the evidence adduced against them, to introduce evidence on their own behalf, and to present an argument in support of their positions. *Callahan v. Pennsylvania State Police*, 494 Pa. 461, 431 A.2d 946 (1981).

11. *See* 2 Pa.C.S. § 106.

ments makes the procedural provisions of the Administrative Agency Law inapplicable. Instead, they contend, this Court should defer to the expertise of the Department by reviewing its decision based solely upon the record before it to determine whether it acted arbitrarily or capriciously or abused its discretion. The Policyholders and Reinsurers advance a different interpretation and argue that, by requiring judicial review, Section 207(d) of the GAA Amendments incorporates the Administrative Agency Law and the scope of review set forth in Section 703 of that law.

We are confronted then with resolving whether there is a missing link between the two provisions of the GAA Amendments: one that requires only a public informational hearing and the other that provides for judicial review in a manner prescribed by law without specifying an intermediate step following the informational hearing. The issue presented involves an interpretation of what the General Assembly intended when it included the language "judicial review in the manner and within the time provided or prescribed by law" in Section 207(d) of the GAA Amendments.[12] In other words, the issue becomes whether the General Assembly intended to make the Administrative Agency Law applicable to the proceedings before the Department or did it intend to create an entirely distinct procedure. To resolve this issue, it is best to examine what would have happened if the Department had denied INA Financial's application for approval of its plan for restructure and division and the procedure that would have been employed prior to conducting judicial review.

■ Had the Department denied INA Financial's application for approval, that decision, as INA Financial agrees, would have been an adjudication. Section 101 of the Administrative Agency Law defines an adjudication as:

> Any final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made.

2 Pa.C.S. § 101. In interpreting this provision, we have held that any agency action determining the personal or property rights or obligations of the parties before an agency in a particular proceeding is an adjudication. *Insurance Company of North America v. Insurance Department,* 15 Pa.Cmwlth. 462, 327 A.2d 411 (1974). If, however, the agency action does not affect the rights of the parties, but only affects the interest of the public in general, then the action will not be deemed an adjudication. *Insurance Department v. Pennsylvania Coal Mining Association,* 25 Pa.Cmwlth. 3, 358 A.2d 745 (1976); *Xun Imaging Associates, Ltd. v. Department of Health,* 165 Pa.Cmwlth. 112, 644 A.2d 255 (1994).

If its application had been denied, INA Financial would have certainly had a right to challenge that denial because it was "aggrieved" by the decision and was a party to the "proceeding." The decision of the Department would have affected INA Financial's interests by denying it the right to divide. Moreover, the only hearing conducted would have been the public informational hearing where, like Policyholders and Reinsurers, INA Financial did not receive a trial-type due process hearing: it did not have the right to cross-examine the Policyholders' and Reinsurers' witnesses and did not have access to the information the Department received *ex parte* and relied upon in rendering its decision.

■ Examining the GAA Amendments and corresponding procedure in that light, we conclude that the General Assembly intended to interpose the procedures of the Administrative Agency Law between the determination after the informational hearing and judicial review. We come to that conclusion because the only law that delineates the

12. Under the Federal Administrative Law, the Department's decision would constitute informal action and would be subject to review under the "hard look" doctrine. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Under Pennsylvania's Administrative Agency Law, there is no provision dealing with "informal agency action." The only question is whether the action is an adjudication, and if it is, all of the provisions of the Administrative Agency Law apply.

manner in which a court is to conduct judicial review of an administrative agency decision is the Administrative Agency Law, and the only means by which a court can conduct that review is upon a full and complete record of the proceedings before the agency. Therefore, the provision of the GAA Amendments for judicial review "in a manner prescribed by law" necessarily makes the Administrative Agency Law applicable. 2 Pa.C.S. § 106;[13] *Turner.*

This scenario is followed by most administrative agencies in rendering an adjudication. A decision is initially made by a reviewer in the agency, and an appeal is then taken to the secretary of that agency or an internal review board. For example, when ruling upon a certificate of need application under the Health Care Facilities Act, the Department of Health initially makes a determination regarding the application. The matter is then appealed to the State Health Facility Hearing Board which conducts a full trial-type hearing under the Administrative Agency Law and renders an adjudication under that law. *Mercy Regional Health System v. Department of Health,* 165 Pa.Cmwlth. 629, 645 A.2d 924 (1994).[14]

■ We are, however, presented with a quandary regarding the proper procedure to be followed before the Department because the Commissioner has already rendered a determination based upon the merits of INA Financial's application for restructure and division. A fundamental requirement of due process is that the parties be afforded a fair trial before an impartial tribunal. *In re*

*Murchison,* 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955); *Blackwell v. Pennsylvania Board of Probation and Parole,* 101 Pa. Cmwlth. 570, 516 A.2d 856 (1986); *Reeves v. Pennsylvania Game Commission,* 136 Pa. Cmwlth. 667, 584 A.2d 1062 (1990). This requirement extends to administrative agencies as well as to the courts. *Blackwell; Reeves.*

Here, the GAA Amendments require the Department to make an initial determination regarding the plan for restructure and division. Because she has already rendered a final decision regarding INA Financial's application, the Commissioner could be considered to have prejudged the matter. Due process would then preclude her from conducting the hearing and making a decision during the Administrative Agency Law phase of the proceedings.[15] To address this concern, the Commissioner should employ the procedure or one similar to that followed by the Department in *Stone & Edwards Insurance Inc. v. Department of Insurance,* 538 Pa. 276, 648 A.2d 304 (1994) for the consideration of new license applications by insurance companies. In those situations, the Department's Bureau of Licensing and Financial Analysis, Division of Agents and Brokers, issues or denies licenses at the Deputy Commissioner level. It does so without a hearing and based upon the information it has gathered concerning the applicant. If an applicant has been denied a license, it may then appeal that determination to the Commissioner, who will then conduct a formal hearing on the license applications. *Id.*

---

13. 2 Pa.C.S. § 106 provides that "[n]o subsequent statute shall be held to supersede or modify the provisions of this title except to the extent that such statute shall do so expressly."

14. It should be noted that the General Assembly has eliminated the certificate of need process since *Mercy Regional.*

15. The Policyholders and Reinsurers also argue that the Commissioner abused her discretion by not recusing herself because of her previous representation of CIGNA and her continued interest in CIGNA's pension plan. Because due process requires the Commissioner to recuse herself, we need not address the Policyholders' and Reinsurers' contentions. We note, however, that to promote faith and integrity in the government, adjudicators should avoid the appearance of impropriety or bias and should recuse themselves whenever those factors appear. The determination of whether a recusal is warranted initially rests with the adjudicator. We leave to the adjudicator's discretion to determine whether, in his or her heart, there is any animus towards or predisposition in favor of the entity appearing as a party before him or her. We will only disturb that discretion when there are objective factors that would augur for recusal. Even if there are no objective factors that would have required the Commissioner's recusal, if the Commissioner was incorrect in her decision that Century Indemnity is adequately funded, the Policyholders will not only believe that her decision was erroneous, but that it emanates from improper motives, irrespective of whether such motives exist.

Under the GAA Amendments, the public informational hearing provides the Department with the opportunity to obtain information necessary to make a decision regarding the restructuring and division of an insurance company. The Department's decision could then be appealed to the Commissioner and a full blown due process hearing would be held. At that hearing, all parties would be provided with the opportunity to make a full and complete record in support of or in opposition to the plan for restructure and division. The Commissioner will then render a final decision based upon that record, which, if necessary, could be appealed to this Court by any aggrieved person.[16]

### III.

Turning now to the facts of the present case, and having determined that the Department's decision would have been an adjudication as to INA Financial had the Department denied the application for approval of INA Financial's plan for restructure and division, the issue remains as to whether it is an adjudication as to the Policyholders and Reinsurers. That issue is determined by whether the Policyholders' and Reinsurers' rights are affected by the Department's order, or viewed from a different perspective, whether the Policyholders and Reinsurers have standing to challenge the Department's decision. The Department and INA Financial argue that the Policyholders and Reinsurers lack standing because they were not parties to the proceedings before the Department and because they have no rights affected by the Commissioner's decision. The Department and INA Financial argue that the interests of the Policyholders and Reinsurers were unaffected by INA Financial's allocation of business to Century Indemnity, and as such, the Policyholders and Reinsurers were unaffected by the Department's decision.

As previously indicated, an agency decision will be considered an adjudication only if it affects the interests of the *parties* to the proceedings. If the decision only affects the

public in general and not any particular party, it is not an adjudication. Section 101 of the Administrative Agency Law defines a "party" as being "[a]ny person who appears in a proceeding before an agency who has a direct interest in the subject matter of such proceeding." 2 Pa.C.S. § 101. As stated by this Court:

> A person is a party to a proceeding if named as such or he may become a party by timely action if authorized by other applicable statutory law to do so or his interest therein is of constitutional proportions.

*Pennsylvania Coal Mining Association,* 358 A.2d at 748. If there is no statutory law granting status as a party, and if the individual does not take steps to acquire party status in the proceedings, then it will not be considered a party to those proceedings. *Id.*

As to whether an entity has standing to appeal an adjudication, Section 702 of the Administrative Agency Law, 2 Pa.C.S. § 702 provides that:

> Any person aggrieved by an adjudication of a Commonwealth Agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals.

To have standing under Section 702, an entity need not be a party to the proceedings, but instead, need only be an aggrieved person, who has a direct interest, as opposed to a direct, immediate and substantial interest, in the adjudication. *See Pennsylvania Department of Aging v. Lindberg,* 503 Pa. 423, 469 A.2d 1012 (1983); *Pennsylvania Automotive Association v. State Board of Vehicle Manufacturers, Dealers and Salespersons,* 121 Pa.Cmwlth. 352, 550 A.2d 1041 (1988). One has a direct interest in the adjudication if he or she is able to show that the adjudication caused harm to his or her interest, or alternatively, that the purported harm resulted in some demonstrable way from the adjudication. Moreover, where the administrative agency is directed by its enabling statute

---

16. On the other hand, if no party is aggrieved by the Department's decision, and there is no request for a hearing under the Administrative

Agency Law, then the Department's decision would become final and controlling.

to take into consideration the effect of its decision upon a particular class of individuals, then those individuals may have standing under the Administrative Agency Law to challenge the agency's decision on the basis that it did not fulfill its statutory duty. *See Cashdollar v. State Horse Racing Commission*, 143 Pa.Cmwlth. 650, 600 A.2d 646 (1991).

Here, the interests of the Policyholders and Reinsurers define part of the standard for Department approval of financial reorganization. Section 205(a) of the GAA Amendments provides that:

> General rule.—Any plan of ... asset transfer [or] division of any insurance corporation ... shall become effective only if approved by the Insurance Department.

15 P.S. § 21205(a). As to the approval of asset transfer or division required by the Department, Section 205(b) of the GAA Amendments specifies that such transactions "shall be approved if it is in accordance with law and *not injurious to the interests of the policyholders and creditors*." 15 P.S. § 21205(b) (emphasis added).

Whether policyholders are parties whose interests are affected by a decision of the Department under the GAA Amendments has not been addressed by our courts.[17] We nevertheless find guidance from case law interpreting Section 641 of the Insurance Department Act.[18] That section of the Insurance Act was interpreted by this Court in *Pennsylvania Association of Independent Insurance Agents v. Foster*, 150 Pa.Cmwlth. 572, 616 A.2d 100 (1992). In that case, the Commissioner issued an order to show cause alleging that the United Services Automobile Association (USAA), a savings and loan institution, had violated Section 641 by selling insurance in Pennsylvania. The Association of Independent Insurance Agents (Association) intervened in that proceeding. The Commissioner and USAA entered into a settlement agreement that ended the adminis-

trative proceeding. Without allowing the Association to brief its objections to the agreement, the Commissioner gave it her final approval. When the Association appealed the Commissioner's approval of the settlement agreement to this Court, USAA filed a motion to quash the appeal on the basis that the settlement agreement was not an adjudication and that the Association did not have standing.

This Court denied the motion to quash, holding that the settlement agreement was an adjudication that the Association had standing to appeal. In so doing, this Court first cited *Department of Health v. Rehab Hospital Services Corp.*, 127 Pa.Cmwlth. 185, 561 A.2d 342 (1989), *petition for allowance of appeal denied*, 525 Pa. 607, 575 A.2d 571 (1990). There, a settlement agreement between the Department of Health and a private party on a certificate of need application, which was appealed by an intervenor before the Department of Health, was held reviewable as an adjudication. Additionally, this Court noted that the purpose of Section 641 of the Insurance Act was to protect independent insurance companies, thus creating a property right in those companies to be protected from the unfair competition of lending institutions. Because the settlement agreement would have subjected the Association to unfair competition, this Court determined it to be an adjudication.

As to whether the Association had standing, this Court held that an actual injury to the Association was not a prerequisite to confer standing. Instead, the financial interest of the Association constituted a sufficient interest to create standing. This Court held that the Association's interest, in conjunction with the fact that the Association had intervened in the administrative proceeding, led to the conclusion that the Association did

---

17. Neither the parties nor our research has discovered a similar statute governing the division of insurance companies in other jurisdictions.

18. Section 641 of the Insurance Act prohibits lending institutions and other enumerated entities from engaging in the insurance business. Act of May 17, 1921, P.L. § 789, *as amended*, 40

P.S. § 281. Under Section 641, the Commissioner is authorized to promulgate regulations to effectuate the purposes of that section, which include the minimization of unfair competitive practices by lending institutions against insurance companies, agents, and brokers.

have standing to appeal the Commissioner's approval of the settlement agreement.[19]

■ Extending the reasoning of *Association of Independent Insurance Agents* to the present case, the Department's approval of the division and restructuring of INA Financial constituted an adjudication as to the Policyholders. Section 205(b) of the GAA Amendments specifies that the Department must base its decision upon a determination that the restructure and division is not injurious to policyholders and creditors. As with

Section 641 of the Insurance Act, this provision creates an interest in the Policyholders in being protected from injury by the division and restructuring of INA Financial. This interest was created because policyholders have a particular interest in assuring that any division of the company with whom they originally obtained insurance will be able to carry out the responsibilities under the policies.[20] Because the Policyholders' interests were affected by the Department's approval of INA Financial's plan for restructure and division,[21] and in light of the fact that they

19. This determination is supported by the definition standing to challenge administrative agency action in federal courts and other states. The United States Supreme Court has established a test that requires not only an injury in fact but also an interest asserted by the complainant within the zone of interests sought to be protected or regulated by the statute in question. *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). In *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), tenant farmers, who were eligible for payments under an act administered by the Secretary of Agriculture, challenged the Secretary's amendments to certain regulations to allow assignment of the payments. They alleged that the amendments adversely affected their ability to lease farm land and to finance their other farm needs. The Supreme Court held that because the act stated that the Secretary should "as far as practicable, protect the interests of tenants," the tenant farmers were within the zone of interest protected by the statute and had standing to challenge the Secretary's actions. *Id.* at 164, 90 S.Ct. at 836. *But see Hernandez–Avalos v. Immigration and Naturalization Service*, 50 F.3d 842 (10th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 92, 133 L.Ed.2d 49 (1995) (where statute makes clear no enforceable right or benefit created, no one can satisfy the zone of interests test to challenge the administrative action).

Likewise, in *Clarke v. Securities Industry Association*, 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987), on the application of two national banks, the Comptroller of the Currency made an administrative decision that the proposed offices which would offer discount brokerage services to the public did not violate the relevant statute. A trade association representing brokers brought an action contending that the Comptroller's approval of the offices violated the statute. Holding that the trade association had standing to challenge the Comptroller's action, the Supreme Court stated:

The "zone of interest" test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency deci-

sion. In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interest are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. The test is not especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff.

*Id.* at 399–400, 107 S.Ct. at 757–758.

In state courts, standing also considers whether the complaining party was intended to be considered or protected by the statute being administered. For example, the Supreme Court of Washington has held that competing hospitals have standing to challenge the grant of a certificate of need even though the act does not mention their rights, because the purpose of the act is to control health care costs to the public, which by necessity includes limiting competition. *St. Joseph Hospital and Health Care Center v. Department of Health*, 125 Wash.2d 733, 887 P.2d 891 (1995); *see also Humana of Kentucky, Inc. v. NKC Hospitals, Inc.*, 751 S.W.2d 369 (Ky.1988).

20. In its *amicus curiae* brief, the National Conference of Insurance Guaranty Funds suggests that the policies delegated to Century Indemnity will not be covered by guarantee funds in the event of insolvency because they were not originally issued by Century Indemnity.

21. In support of their motion to quash for lack of standing, the Department and INA Financial argue that the harm asserted by the Policyholders is too speculative to confer standing upon them. The Department and INA Financial contend that, even if Century Indemnity is underfunded, and even if the Department erred in approving the plan for restructure and division, the Policyholders have not suffered any direct harm as a result of the Department's decision; any injury to the Policyholders would occur at an undetermined later time. This argument, however, disregards the fact that the Department, in ruling on an application for restructure and division, must consider the subsequent effects upon policyholders and creditors. Just as INA Financial was

intervened in the proceedings before the Department, they have standing to appeal the Department's order.

■ On the other hand, the Department's order is not an adjudication with respect to the Reinsurers. Section 205(b) does not specifically provide that the Reinsurers be protected from injury by the restructure or division of an insurance company. They are neither policyholders nor creditors. Instead, they contend that they are harmed by the Department's order because they have specific contractual and other specific legal relationships with CIGNA and INA Financial. Contractual relationships are not protected from injury under Section 205(b). Additionally, the Department's decision does not leave the Reinsurers without another forum in which to assert their rights. If INA Financial's application for approval and subsequent division would adversely affect the Reinsurers' contract rights, then they can pursue those rights via a cause of action in contract in a court of law. Such a cause of action would provide the appropriate forum for determining whether the contracts between the Reinsurers and INA Financial prohibit the division and for ascertaining the damages, if any, recoverable by the Reinsurers. Consequently, the Department's order does not constitute an adjudication as to the

Reinsurers, and therefore, the Reinsurers lack standing to appeal that order.

### C.

■ Because the Department's decision constitutes an adjudication as to the Policyholders, and because the Policyholders have standing to appeal that decision, the Department was required to comply with the Administrative Agency Law. In the present case, however, the Department did not do so. First, because the Department withheld the Tillinghast report from the record certified to this Court, and because, as alleged by the Policyholders, other financial information was withheld from the record by the Department, a full and complete record was not kept of the proceedings before the Department.[22] Furthermore, the Policyholders were not given the opportunity to cross-examine the witnesses presented before the Department and were denied the opportunity to view and address a significant portion of the information and arguments presented by INA Financial in support of its plan for restructure and division. Additionally, with the exception of being allowed to present oral statements that could not exceed fifteen minutes, the Policyholders were not allowed to present evidence or make arguments in opposition to the plan for restructure and division.[23]

required to establish that no negative effects will occur at a later date, the Policyholders are entitled to offer evidence and challenge the Department's decision on the basis that it will have deleterious effects upon their interests in the future.

22. Absent a complete record, this Court cannot conduct the meaningful appellate review contemplated by the GAA Amendments and the Administrative Agency Law.

23. In arguing that the Policyholders were entitled to nothing more than the informal hearing, the Department and INA Financial cite to *City of Pittsburgh v. Insurance Department*, 448 Pa. 466, 294 A.2d 892 (1972), and *Pennsylvania Dental Association v. Insurance Department*, 92 Pa. Cmwlth. 77, 498 A.2d 990 (1985), *aff'd in part and appeal dismissed in part*, 512 Pa. 217, 516 A.2d 647 (1986). Both of those cases involved an interpretation of the procedure required under what was commonly referred to as the Hospital Plan Corporations Act, formerly 40 Pa.C.S. §§ 6101–6127. Section 6102(e) of that Act provided that:

**Procedure before the department.**—For the purpose of enabling the department to make the finding or determination required by subsection (d) of this section, the department, by publication of notice in the Pennsylvania Bulletin, shall afford reasonable opportunity for hearing, which shall be public, and, before or after any such hearing, it may make such inquiries, audits and investigations, and may require the submission of such supplemental studies and information, as it may deem necessary or proper to enable it to reach a finding or determination.... In every case, the department shall make a finding or determination in writing, stating whether or not the application has been approved, and if it has been approved in part only, specifying the part which has been approved and the part which has been denied....

40 Pa.C.S. § 6102(e). Both our Supreme Court in *City of Pittsburgh* and this Court in *Pennsylvania Dental Association* held that this provision did not require the Insurance Commissioner to provide a full blown due process hearing under the Administrative Agency Law. Because Section 6102(g) of the Health Plan Corporations Act

Because the Department did not comply with the Administrative Agency Law in rendering an adjudication that affected the Policyholders' interests, the Department's order is vacated. However, because of the way in which this case was resolved, the informal hearing need not take place again. Rather, the case is remanded for a formal hearing to be conducted in accordance with the Administrative Agency Law before an impartial adjudicator.[24]

### ORDER

AND NOW, this *5th* day of *March*, 1997, it is ordered that:

1. The order of the Insurance Commissioner of Pennsylvania at No. MS95–10–056, dated February 7, 1996, is vacated.

2. The matter is remanded to the Insurance Department with the specific directions to conduct a hearing in compliance with the Administrative Agency Law, 2 Pa.C.S. §§ 101, 501–508, 701–704, and the Insurance Commissioner is directed to recuse herself and appoint an individual to assume her adjudicatory functions in the above-captioned matter.

3. Respondents' motion to quash for lack of standing is granted with respect to the reinsurers and is denied with respect to the policyholders; on remand, the fact finder is directed to make specific findings of fact regarding the status of each petitioner as a policyholder or reinsurer.

4. Jurisdiction relinquished.

LEADBETTER, J., dissents.

COLINS, President Judge, did not participate in the decision of this case.

employs the same language as Section 102(g) of the GAA Amendments, the Department and INA Financial argue, the Commissioner was not required to provide the Policyholders with an adversarial hearing under the Administrative Agency Law, and conversely, the Policyholders were not entitled to such a hearing.

While the Department and INA Financial are correct in their assertion that the administrative procedure provisions of the *Health Plan Corporations Act* and the GAA Amendments are identical, the Policyholders are nevertheless entitled to an adversarial hearing on INA Financial's plan of restructure and division. Unlike the Health Plan Corporations Act, which requires the Department only to find and determine that the application *complies with the provisions of that act* and the regulations of the Department, the GAA Amendments also require the Department

to determine that the transaction at issue is not injurious to the interest of the policyholders and creditors. 40 P.S. § 21205(b). As previously indicated, this provision of the GAA Amendments creates an interest in the policyholders that is entitled to protection under the Administrative Agency Law. Because no such interest is created by the Health Plan Corporations Act, the case law interpreting that act is not controlling here.

24. The Policyholders also argue that the Commissioner's decision allowing the division and restructure of INA Financial unconstitutionally interferes with their contracts, i.e, the insurance policies. Because there is not a complete record before us, we need not address this issue at this time.