**William ONDEK, Robert Silber and Michelle Obid, Appellants**

v.

**ALLEGHENY COUNTY COUNCIL and Allegheny County Chief Executive, James Roddy.**

Commonwealth Court of Pennsylvania.

Argued Oct. 5, 2004.

Decided Nov. 1, 2004.

James G. Georgalas, Pittsburgh, for appellant.

George M. Janacsko, Pittsburgh, for appellee.

BEFORE: FRIEDMAN, Judge, and LEAVITT, Judge, and FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

William Ondek, Douglas Fowkes, Sharon Pillar, Robert Silber and Michelle Obid (Appellants), in their capacity as taxpayers and residents of Allegheny County (County), appeal from an order of the Court of Common Pleas of Allegheny County (trial court) dated December 30, 2003. In its order, the trial court denied Appellants' appeal under the Local Agency Law[1] challenging the enactment of Resolution 01–03–RE (Resolution) by the Allegheny County Council (Council). The Resolution authorized the use of "tax increment financing" (TIF)[2] to finance certain costs of a proposed commercial development project in Ohio Township, Allegheny County.

In October 2001, Developers Diversified Realty ("DDR") submitted an application to the Allegheny County Department of Economic Development requesting that the County use tax increment financing to assist DDR with financing public infrastructure improvements in connection with its plan to construct the Mt. Nebo Pointe Retail Center (Mt. Nebo Pointe). DDR described Mt. Nebo Pointe as an "Office, Hotel and Commercial project containing 50,000 [square feet] of office, 150 hotel rooms, convenience gas station, restaurants, food store and major retailers. Outparcels will contain 22,000 [square feet] of space. Center will contain 355,600 [square feet] of space." Reproduced Record at 216a (R.R.——). DDR estimated that Mt. Nebo Pointe would cost approximately $35 to $40 million, produce 1,000 permanent jobs and provide substantially increased tax revenues to the affected local taxing bodies: Allegheny County, Ohio Township and the Avonworth School District.

In March 2002, Ohio Township and the Avonworth School District each enacted resolutions authorizing the Redevelopment Authority of Allegheny County (Redevelopment Authority) to prepare a statutorily required "project plan"[3] for a redevelop-

---

1. 2 Pa.C.S. §§ 551–555, 751–754.

2. Tax increment financing is "a technique used by a municipality to finance commercial developments [usually] involving issuing bonds to finance land acquisition and other up-front costs, and then using the additional property taxes generated from the new development to service the debt." Blacks Law Dictionary at 1502 (8th ed.2004). The Tax Increment Financing Act, Act of July 11, 1990, P.L. 465, *as amended,* 53 P.S. 6930.1–6930.13, was enacted in response to what the General Assembly perceived as a failure of the Urban Redevelopment Law, Act of May 24, 1945, P.L. 991, *as amended,* 35 P.S. 1701–1747, to cure blighted conditions in the Commonwealths urban communities. 53 P.S. 6930.2(a)(1) and (2). Hence the stated purpose of the Tax Increment Financing Act was to "provide an alternative method for use by authorities in pursuing redevelopment efforts under the Urban Redevelopment Law and other applicable laws." 53 P.S. 6930.2(a)(3).

3. The Tax Increment Financing Act defines a "Project plan" as "[t]he properly approved plan for the development or redevelopment of a tax increment district, including all properly approved amendments to the plan." 53 P.S. § 6930.3. Further,

> The authority shall prepare a project plan for each tax increment district and submit the plan to the governing body of the municipality which will create the district and to the governing body of any other municipality or school district that levies property taxes within the boundaries of the proposed district. The plan shall include the following:

(i) A statement listing the kind, number and location of all proposed public works or improvements and/or all residential, commercial or industrial development and revitalization improvements.

(ii) An economic feasibility study of the project and the fiscal effects on the municipal tax base.

(iii) A detailed list of estimated project costs.

(iv) A description of the methods of financing all estimated project costs and the time when related costs or monetary obligations are to be incurred.

(v) A map showing existing uses and conditions of real property in the district.

ment area in Ohio Township. A similar resolution was subsequently adopted by Council. The Redevelopment Authority's professional staff studied the proposed redevelopment area, designated as the "Green Valley Study Area," which included the proposed site of Mt. Nebo Pointe. The staff issued a "Basic Conditions Report" describing the area as follows:

> The Green Valley Study Area incorporates an area spanning approximately 293 acres. The Study Area consists predominantly of steeply-sloped woodlands and floodplains. Additionally, a 9–hole public golf course consisting of nearly 45 acres and surface parking facilities occupying less than an acre exist within the Study Area. There are seven residential structures in various states of disrepair in the Study Area that are uninhabited, two sheds with one still in use and another structure in use as the club house for the golf course; these buildings have no historical or architectural significance.

R.R. 228a.

The authors of the Report recited the statutory criteria for determining that an area is blighted[4] and concluded that four of those criteria were satisfied in the Green Valley Study Area: economically undesirable land uses; faulty street and lot layout; unsafe, unsanitary, inadequate or overcrowded conditions of the dwellings and inadequate planning of the area. The Basic Conditions Report concluded with two recommendations: (1) that the Green Valley Study Area "be declared an Area in Need of Redevelopment according to the criteria outlined in the Pennsylvania [Urban] Redevelopment Law"; and (2) that the area "be designated a certified Redevelopment Area by the Board of Supervisors of Ohio Township and the Redevelopment Authority of Allegheny County." R.R. 232a.

Ohio Township and the Redevelopment Authority accepted the recommendations of the Basic Conditions Report. On July 8, 2002, Ohio Township's Board of Supervisors enacted a resolution finding the Green Valley Study Area to be blighted. On August 28, 2002, the Redevelopment Authority Board also adopted a resolution certifying to Council that the Green Valley Study Area is blighted and in need of redevelopment under the Urban Redevelopment Law.

On October 9, 2002, the Redevelopment Authority prepared a project plan entitled "Mt. Nebo Pointe Tax Increment Financing Plan" (TIF Plan) for consideration by the affected local taxing bodies. In accordance with Section 5 of the Tax Increment Financing Act, the TIF Plan included, in-

---

(vi) A map showing proposed improvements and uses therein.
(vii) Proposed changes of any zoning ordinance, master plan, map, building code or ordinance.
(viii) A list of estimated nonproject costs.
(ix) A statement of a proposed method for the relocation of families, persons and businesses to be temporarily or permanently displaced from housing or commercial facilities in the project area by implementation of the plan.

53 P.S. § 6930.5(a)(4).

**4.** Section 2 of the Urban Redevelopment Law provides as follows:

It is hereby determined and declared as a matter of legislative finding—(a) That there exist in urban communities in this Commonwealth areas which have become blighted because of the unsafe, unsanitary, inadequate or over-crowded condition of the dwellings therein, or because of inadequate planning of the area, or excessive land coverage by the buildings thereon, or the lack of proper light and air and open space, or because of the defective design and arrangement of the buildings thereon, or faulty street or lot layout, or economically or socially undesirable land uses.

35 P.S. § 1702(a).

*ter alia*, a description of the proposed Mt. Nebo Pointe project, the specific roadway, sewer and water infrastructure improvements that would be undertaken with the TIF proceeds and an economic feasibility analysis concerning the proposed project with detailed information on job creation, tax revenues and financing of revenue bonds to pay for the public improvements. The Ohio Township Board of Supervisors and the Avonworth School Board enacted resolutions agreeing to use tax increment financing for the Mt. Nebo Pointe project in accordance with the TIF Plan.

At its regularly scheduled meeting on October 22, 2002, Council gave a first reading to the Resolution, which authorized the County's participation in the TIF Plan and created the Mt. Nebo Pointe Tax Increment Financing District. The proposed Resolution was referred to Council's Committee on Economic Development for review and recommendation. Council also adopted a separate motion scheduling a public hearing on the Resolution for November 26, 2002 and directed its clerk to advertise notice of the hearing as required by Section 5 of the Tax Increment Financing Act, 53 P.S. § 6930.5(a)(5).[5] The public hearing was advertised in the *Pittsburgh Post-Gazette* on October 22, 2002.

Council's Economic Development Committee met on November 6, 2002. At that meeting, Steve Morgan, the Director of the County's Department of Economic De-

velopment, and Ralph Conti, a vice president for DDR, provided the members of the committee with basic preliminary information on Mt. Nebo Pointe, including its proposed location and the reasons why tax increment financing was not only necessary for the project but beneficial to the public.

On November 26, 2002 Council conducted its public hearing as advertised regarding the County's participation in the TIF Plan. At this hearing, Mssrs. Morgan and Conti again testified about the proposed Project and the necessity of tax increment financing. Council also heard comments from thirty-six members of the general public, including four of the five Appellants.

On January 7, 2003, Council's Economic Development Committee held its first regularly scheduled meeting for 2003. At that meeting, which was attended by six of its seven members, the committee voted 4–2 to recommend adoption of the Resolution by the full Council. Council met on January 22, 2003 and, after some debate, approved the Resolution by a vote of 11–3 with one abstention. Council's Chief Executive signed the Resolution on January 28, 2003. The Resolution enumerated the findings required by the Tax Increment Financing Act,[6] created a TIF District to be known as the Mt. Nebo Pointe Tax Increment Financing District for a term of twenty years, specifically adopted the TIF

---

**5.** It provides:

> The governing body of the municipality which will create the tax increment district shall hold at least one public hearing at which interested parties are afforded a reasonable opportunity to express their views on the concept of tax increment financing, on the proposed creation of a tax increment district and its proposed boundaries, on the proposed adoption of a project plan for the district and the benefits to the municipality. *Notice of the hearing shall be published in*

> *accordance with the terms of . . . the Sunshine Act [65 Pa.C.S. §§ 701–716],* and said notice shall be provided by first class mail, postage prepaid, to the governing body of any municipality or school district that levies property taxes within the boundaries of a proposed tax increment district. *This notice shall be provided not less than 30 days before the date of the hearing.*

> 53 P.S. § 6930.5(a)(5) (emphasis added).

**6.** *See* n. 3, *supra.*

Plan prepared by the Redevelopment Authority and pledged sixty percent (60%) of tax revenues generated by Mt. Nebo Pointe for the repayment of any debt issued by the Redevelopment Authority to pay for the public infrastructure improvements described in the TIF Plan.

■ On February 27, 2003, Appellants filed an appeal to the trial court under the Local Agency Law. Appellants challenged Council's enactment of the Resolution on both procedural and substantive grounds. The trial court found no merit to Appellants' arguments and denied their appeal. This timely appeal followed, in which Appellants continue to raise procedural and substantive challenges to Council's enactment of the Resolution.[7]

As a threshold matter we must address Council's argument, raised for the first time on appeal, that Appellants' action should have been dismissed as an improper appeal under the Local Agency Law.[8] The Local Agency Law states that "[a]ny person aggrieved by an *adjudication* of a local agency who has a direct interest in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42 (relating to judiciary and judicial procedure)." 2 Pa.C.S. § 752 (emphasis added). Council argues that the Resolution was not an adjudication and that Appellants' appeal was an improper chal-

lenge of legislative action by a local governing body.

■ For purposes of the Local Agency Law, an "adjudication" is "[a]ny final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made." 2 Pa.C.S. § 101. In interpreting this provision, we have held that any agency action determining the personal or property rights or obligations of the parties before an agency in a particular proceeding is an adjudication. *LaFarge Corp. v. Commonwealth, Insurance Department,* 690 A.2d 826, 833 (Pa.Cmwlth.1997), *rev'd on other grounds,* 557 Pa. 544, 735 A.2d 74 (1999). "If, however, the agency action does not affect the rights of the parties, but only affects the interest of the public in general, then the action will not be deemed an adjudication." *Id.* (citing *Insurance Department v. Pennsylvania Coal Mining Association,* 25 Pa. Cmwlth. 3, 358 A.2d 745 (1976); *Xun Imaging Associates, Ltd. v. Department of Health,* 165 Pa.Cmwlth. 112, 644 A.2d 255 (1994)).

■ Appellants assert that the Resolution was adjudicative in nature and that the present case is analogous to *North Point Breeze Coalition v. City of Pittsburgh,* 60 Pa.Cmwlth. 298, 431 A.2d 398

---

7. Our standard of review, where the trial court takes no additional evidence, is limited to determining whether constitutional rights were violated, an error of law was committed or whether necessary findings of fact were supported by substantial evidence of record. *SSEN, Inc. v. Borough Council of Borough of Eddystone,* 810 A.2d 200, 208 n. 11 (Pa. Cmwlth.2002); Section 754(b) of the Local Agency Law, 2 Pa.C.S. § 754(b).

8. This issue is not waived because, as Council points out, "the general rule that issues not raised in the lower court may not be raised on

appeal applies only to appellants, not to appellees." *Sullivan v. Department of Transportation, Bureau of Driver Licensing,* 550 Pa. 639, 644, 708 A.2d 481, 483 (1998). In any event, because the question of whether Appellants' appeal was proper raises jurisdictional concerns, we may raise the issue *sua sponte.* See *Popowsky v. Public Utility Commission,* 701 A.2d 277 (Pa.Cmwlth.1997) (in challenge to PUC regulations, Commonwealth Court, *sua sponte,* raised question of whether appeal was proper).

(1981). We disagree. In *North Point Breeze Coalition,* individual landowners appealed from the passage of a resolution by Pittsburgh City Council that effectively granted a conditional use permit to a women's shelter. The trial court quashed the appeal on the grounds that council's action was a legislative enactment from which no right of appeal existed. We reversed, noting that a resolution may be adjudicative in nature since "a municipal governing body may act in an administrative role as well as in a legislative capacity." *Id.* at 400. We reasoned that

> [t]he council, in passing the resolution, did not enact a new ordinance or amend the existing ordinance. The resolution was not legislative in nature because it established no rule of general application.... On the contrary, the council, by allowing the applicant to use the property as an institutional facility through a conditional use permit, applied the specific criteria outlined in ... the ordinance to a single applicant and one designated piece of land. Council essentially approved the issuance of a permit, nothing more.

*Id.*

*North Point Breeze Coalition* is distinguishable from the case *sub judice.* Here, Council enacted an entirely new resolution, as it was required to do under the Tax Increment Financing Act,[9] whereas the city council in *North Point Breeze Coalition* applied the city's existing zoning ordinance to enact a resolution that was really a subterfuge for granting a conditional land use permit. Clearly the latter resolution affected the "personal or property rights or obligations" of the applicant and the adjoining landowners, as is the case in

any land use appeal. The TIF Resolution, on the other hand, is a legislative act intended to spur local development. The land development and financing scheme created by the Resolution affects the interests of all of the residents of Allegheny County, particularly those who pay real estate taxes on properties within the TIF district. Indeed, a tax resolution is a prime example of an "agency action" that necessarily affects the interest of the public in general and not just those individual citizens who decide to mount a legal challenge to such a resolution.

In sum, we agree with Council that the Resolution was a purely legislative enactment and not an adjudication. The trial court lacked jurisdiction to hear Appellants' appeal under the Local Agency Law and should have dismissed the action on that basis.

Accordingly, the trial court's order dated December 3, 2003, is vacated and the matter is remanded with direction to the trial court to dismiss Appellant's appeal. Jurisdiction is relinquished.

## ORDER

AND NOW, this 1st day of November, 2004, the order of the Court of Common Pleas of Allegheny County dated December 3, 2003, in the above-captioned matter is vacated and the matter is remanded with direction to the trial court to dismiss Appellant's appeal for lack of jurisdiction.

Jurisdiction is relinquished.

9. Section 5 of the Tax Increment Financing Act, which states that "[i]n order to create a district and adopt a project plan, the governing body of the municipality which will create the tax increment district shall adopt ... a resolution or ordinance." 53 P.S. § 6930.5(a)(6). The municipality may be a county. 53 P.S. § 6930.5(a)(3).